**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MARJORIE FRIEDMAN SCHERR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  Case No. _____ |
| | ) |
| MARRIOTT INTERNATIONAL, INC., | ) |
| COURTYARD MANAGEMENT | ) |
| CORPORATION, COURTYARD II | ) |
| ASSOCIATES, LP, and MARRIOTT | ) |
| INTERNATIONAL DESIGN AND | ) |
| CONSTRUCTION SERVICES, INC., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## COMPLAINT

Plaintiff Marjorie Friedman Scherr alleges:

### INTRODUCTION

1.      This is an action for declaratory and injunctive relief based on defendants' refusal

to correct an unreasonably dangerous and unsafe condition for disabled guests at defendants'

Marriott Courtyard hotels throughout the United States, in violation of Title III of the Americans

With Disabilities Act ("ADA"), 42 U.S.C. §12101, *et seq*.  Namely, with respect to the

purportedly "ADA-accessible" guestrooms at the Marriott Courtyard hotel in Overland Park,

Kansas, and the purportedly "ADA-accessible" guestrooms at the approximately 56 additional

Marriott Courtyard hotels owned, operated, managed and/or controlled by defendants throughout

the United States, defendants have:  (a) "failed to make alterations in such a manner that, to the

maximum extent feasible, the altered portions of the facility are readily accessible to and usable

by individuals with disabilities;" (b) "failed to remove architectural barriers ... in existing

facilities ... where such removal is readily achievable;" and (c) refused to correct an

unreasonably dangerous and unsafe condition for plaintiff and other disabled guests.

2.      The unreasonably dangerous and unsafe condition for disabled guests at defendants' Marriott Courtyard hotels throughout the United States has been created and continues to exist by the use of a self-closing spring-hinged door in the bathrooms of what defendants hold out as "ADA-accessible" guestrooms.  Plaintiff Marjorie Friedman Scherr sustained serious personal injuries in 2006 when she was struck by a self-closing spring-hinged bathroom door in Room 143, an "ADA-accessible" guestroom at the Marriott Courtyard hotel in Overland Park, Kansas.  Use of the spring-hinge on bathroom doors of "ADA-accessible" guestrooms renders such rooms inaccessible, and presents and continues to present an unreasonably dangerous and unsafe condition to disabled hotel guests.

3.      As recently as April 2010, despite their long-standing knowledge of these facts, including in the context of the related litigation of *Scherr v. Marriott Int'l Inc., et. al.*, No. 08 C 2098 (N.D. Ill.), defendants have refused and continue to refuse to correct the unreasonably dangerous and unsafe condition.  As a result, defendants have placed disabled guests at risk of serious physical injury, including death, in purportedly "ADA-accessible" guestrooms at as many as 57 Marriott by Courtyard hotels throughout the United States.

4.      Unless the relief sought herein is granted or unless and until defendants alter their Marriott Courtyard hotels throughout the United States so that such facilities are readily accessible to and usable by individuals with disabilities to the extent required by the ADA, disabled hotel guests will continue to suffer unlawful discrimination as a result of defendants' conduct, and additional serious injuries will likely be sustained by other disabled guests who use what defendants hold out as "ADA-accessible" guestrooms.

## PARTIES

5.      Plaintiff Marjorie Friedman Scherr is, and has been at all times material herein, a resident of the state of Illinois, in Cook County.

6.      Plaintiff has a neuro-degenerative disease that renders her "disabled" under the ADA (42 U.S.C. §12102) and requires her to make use of a hotel's accessibility features.

Primary among those features was and is a guestroom bathroom door that is accessible to guests who use a walker or wheelchair.

7.     Plaintiff is a private person who was and continues to be denied full and equal enjoyment of defendants' hotel facilities and accommodations as a result of her disabilities. As set forth herein, she was subject to discrimination on the basis of her disabilities in violation of the ADA. Plaintiff would be willing to return to defendants' Overland Park hotel (and stay at defendants' other Courtyard Marriott hotels throughout the United States if she has reason to travel to their locations) only after defendants made the necessary modifications so that the ADA-accessible rooms are safe, and in compliance with ADA regulations and accessibility standards. As a direct result of the discrimination as set forth herein, plaintiff suffered personal injuries, and she suffered and continues to suffer denial of her protected rights.

8.     Defendant Marriott International, Inc. ("Marriott"), is a Delaware corporation headquartered in Bethesda, Maryland. At all times relevant herein, Marriott was and continues to be the parent company of all other Marriott-affiliated corporations, and conducted its business through such wholly-owned affiliated companies, including the Courtyard Kansas City Overland Park hotel in Overland Park, Kansas. As a matrix organization, Marriott oversees all operations relevant to this litigation, and the subsidiary corporate entities named as defendants herein are, and at all relevant times were, the organizational arms by which Marriott operates. At all times relevant herein, Marriott has conducted and continues to conduct business in Illinois, and the business it conducts is directly or indirectly related to the events underlying this complaint.

9.     Defendant Courtyard Management Corporation ("Courtyard") is a Delaware corporation headquartered in Bethesda, Maryland. At all times relevant herein, Courtyard was and continues to be a wholly-owned subsidiary of Marriott, operating and managing with Marriott and on its behalf the Courtyard Kansas City Overland Park hotel in Overland Park, Kansas. At all times relevant herein, Courtyard has conducted and continues to conduct business in Illinois, and the business it conducts is directly or indirectly related to the events underlying

-3-

this complaint.

10.     Defendant Courtyard II Associates, L.P. ("Courtyard II") is a Delaware corporation headquartered in Bethesda, Maryland. At all times relevant herein, Courtyard II was and continues to be a wholly-owned subsidiary of Marriott and owned with Marriott and on its behalf the Courtyard Kansas City Overland Park hotel in Overland Park, Kansas. At all times relevant herein, Courtyard II has conducted and continues to conduct business in Illinois, and the business it conducts is directly or indirectly related to the events underlying this complaint.

11.     Defendant Marriott International Design and Construction Services, Inc. ("MIDCS"), is a Delaware corporation headquartered in Bethesda, Maryland. At all times relevant herein, MIDCS was and continues to be a wholly-owned subsidiary of Marriott, owning, operating, designing and constructing with Marriott and on its behalf the Courtyard Kansas City Overland Park hotel in Overland Park, Kansas. At all times relevant herein, MIDCS has conducted and continues to conduct business in Illinois, and the business it conducts is directly or indirectly related to the events underlying this complaint.

12.     Defendants Marriott, Courtyard, and Courtyard II are, and at all relevant times were, owners and/or operators of the Courtyard Marriott hotel in Overland Park, Kansas, a place of public accommodation, as used in Section 302(a) of the ADA, 42 U.S.C. §12182(a).

13.     Defendants Marriott and MIDCS are, and at all relevant times were, responsible for the design and construction of the hotel facilities, as used in Section 303(a) of the ADA, 42 U.S.C. §12183(a).

14.     Defendants discriminated against plaintiff (and other disabled guests) when they "re-invented" the Overland Park hotel and other Marriott Courtyard hotels throughout the United States, constructed and remodeled the hotels' guestrooms, purported to create rooms specially designated as "ADA-accessible," and failed to offer, provide, rent, design or construct rooms that were readily accessible to and usable by individuals with disabilities. Such facilities are, and at all relevant times were, in violation of ADA accessibility standards (28 C.F.R. Part 36,

Appendix A) and ADA regulations (28 C.F.R. Part 36), and not readily accessible to the maximum extent feasible as required under Section 303(a)(2) of the ADA.

15.     As recently as April, 2010, with full knowledge of the facts of their non-compliance with the ADA as alleged herein, defendants have deliberately refused to remedy the unreasonably dangerous and unsafe condition and unlawful, non-compliant facilities by instituting feasible alternatives.  Plaintiff therefore has reasonable grounds for believing that she and other disabled hotel guests are about to be subjected, and most likely will be subjected, to discrimination in violation of Title III of the ADA.

## JURISDICTION AND VENUE

16.     Plaintiff's claims are brought under Title III of the Americans With Disabilities Act (42 U.S.C. §§12182(a) and 12183(a)).  Accordingly, subject matter jurisdiction is predicated on federal question jurisdiction (28 U.S.C. §1331) and the Declaratory Judgment Act (28 U.S.C. § 2201).

17.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c), in that all of the defendants reside in this District and a substantial part of the events giving rise to the claim took place in this District.

## THE AMERICANS WITH DISABILITIES ACT

18.     Title III of the ADA provides as follows:  "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. §12182(a).

19.     Discrimination prohibited under the ADA includes the following:

Except as provided in subsection (b) of this section, as applied to public accommodations and commercial facilities, discrimination for purposes of section 12182(a) of this title includes–

(1) a failure to design and construct facilities for first occupancy later than 30

months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter; and

**(2)** with respect to a facility or part thereof that is altered by, on behalf of, or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs. Where the entity is undertaking an alteration that affects or could affect usability of or access to an area of the facility containing a primary function, the entity shall also make the alterations in such a manner that, to the maximum extent feasible, the path of travel to the altered area and the bathrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities where such alterations to the path of travel or the bathrooms, telephones, and drinking fountains serving the altered area are not disproportionate to the overall alterations in terms of cost and scope (as determined under criteria established by the Attorney General).

42 U.S.C. §12183(a).

... a failure to remove architectural barriers ... in existing facilities ... where such removal is readily achievable.

42 U.S.C. §12182(b)(2)(A)(iv).

20.     Title III applies to public accommodations, requiring accessible transient lodging at places like the Marriott Courtyard hotel in Overland Park, Kansas.

21.     The enforcement provisions of the ADA provide for injunctive relief and do not require a disabled person such as plaintiff to engage in "a futile gesture" once she knows (as plaintiff here knows) that defendants do not intend to comply with the Act:

(a)     In general

(1)     Availability of remedies and procedures

The remedies and procedures set forth in section 2000a-3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title. Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.

-6-

(2)     Injunctive relief

In the case of violations of sections 12182(b)(2)(A)(iv) and section ...12183(a) of this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by this subchapter. Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this subchapter.

42 U.S.C. §12188.

22.     Design specifications for buildings to comply with the ADA are set forth in 28

C.F.R. Part 36, Appendix A. As explained in *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d

1075, 1080-81 (9th Cir. 2004), these ADA regulations implement the Act:

Congress entrusted the Attorney General with the responsibility of promulgating Title III's implementing regulations. *See* 42 U.S.C. §12186(b) (directing the Attorney General to "issue regulations ... to carry out the provisions of" Title III). Congress further provided that these implementing regulations must be consistent with the minimum guidelines issued by the Architectural and Transportation Barriers Compliance Board ("the Access Board"). *See* 42 U.S.C. § 12186(c). The Access Board provided a notice and comment period for its proposed ADA guidelines in 1991, *see* 56 Fed. Reg. 2296-01 (Jan. 22, 1991), and issued its final ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG") later that year. *See* 56 Fed. Reg. 35,408 (July 26, 1991) (*codified at* 36 C.F.R. Pt. 1191, App. A). The Attorney General adopted, *in toto*, the Access Board's ADAAG as the "Standards for Accessible Design." *See* 28 C.F.R. Pt. 36, App. A. These standards lay out the technical structural requirements of places of public accommodation and are applicable "during the design, construction, and alteration of such buildings and facilities ... under the [ADA]." *See id.* App. A, §1.

23.     While compliance with these minimum standards will not necessitate a finding of

compliance with all accessibility requirements, examination of these ADA regulations "is

necessary in cases that involve the design of a public accommodation under the ADA."

*Fortyune,* 364 F.3d at 1084-85 (*citing Lara v. Cinemark USA, Inc.*, 207 F.3d 783, 786 (5th Cir.

2000).

24.     Section 9 of the ADA standards sets forth the minimum design specifications for

accessible transient lodging, including the number of ADA-accessible guestrooms required for

compliance with the Act (§9.1.2). Under §9.2.2(3), entitled "minimum requirements," the ADA

standards state: "Doors and doorways designed to allow passage into and within all sleeping rooms, suites or other covered units shall comply with §4.13."

25.    Section 4.13 sets forth minimum requirements for accessible doors, including the following:

> **§4.13.10\*  Door Closers**. If a door has a closer, then the sweep period of the closer shall be adjusted so that from an open position of 70 degrees, the door will take at least 3 seconds to move to a point 3 in (75 mm) from the latch, measured to the leading edge of the door.

26.    Under the 2010 ADA Standards, which adopt the standards of the American National Standards Institute ("ANSI"), closers shall be adjusted to close the door from 90 degrees to 12 degrees in a minimum of 5 seconds:

> **404.2.8.1  Door Closers**. Door closers shall be adjusted so that from an open position of 90 degrees, the time required to move the door to an open position of 12 degrees shall be 5 seconds minimum.

27.    Although the text of the ADA standards does not contain notes or footnotes, additional information, explanations and advisory material are located in the Appendix. *See* §3.3. The introduction to the Appendix states as follows:

> This appendix contains materials of an advisory nature *and provides additional information that should help the reader to understand the minimum requirements* of the guidelines or to design buildings or facilities for greater accessibility. ... Sections of the guidelines for which additional material appears in this appendix have been indicated by an asterisk. *Nothing in this appendix shall in any way obviate any obligation to comply with the requirements of the guidelines itself.* (Former emphasis supplied, latter emphasis in original.)

28.    Because the door closing speed in section 4.13.10 contained an asterisk, the reader must look to A4.13.10 for additional information that should assist in understanding ADA's regulatory minimum requirements. That section reads as follows:

> **A4.13.10 Door Closers**. Closers with delayed action features give a person more time to maneuver through doorways. They are particularly useful on frequently used interior doors such as entrances to toilet rooms.

29.    Federal standards for accessible design require door closers in ADA-accessible hotel rooms to have delayed action mechanisms, so that the rooms are usable by guests with

-8-

disabilities. The Department of Justice Checklist for New Lodging Facilities, at 1, states:

> Under the ADA, hotels, motels, inns and other places of lodging designed or constructed after January 26, 1993, must be usable by persons with disabilities. To meet this requirement, lodging facilities must comply with certain regulations published by the Justice Department. The regulations contain detailed architectural requirements called the ADA Standards for Accessible Design (Standards), 28 C.F.R. pt. 36, Appendix A. ... The Standards are designed to ensure accessibility for individuals with a wide variety of different disabilities, such as ... individuals with mobility impairments who use canes, crutches, braces or walkers. ... Lodging facilities must comply with all of the requirements in the Standards that are applicable. And, because a difference of inches or, in some cases, a difference of a fraction of an inch can pose a serious safety hazard or result in the denial of access for persons with disabilities, full compliance with the Standards is essential.

30.     Construed by their plain terms, these ADA regulations implement design requirements for ADA-accessible hotel rooms and require precise minimum closing speeds – effectuated by closers with delayed action features – to give disabled guests more time to exit through doorways without being impacted by a quickly moving self-closing door.

31.     It was and remains well known within the hotel design and construction industry that there are serious hazards and risks of injury associated with falls at elevation on hotel premises, including knock down falls by self-closing doors, in ADA-accessible rooms. Falls are a leading cause of injury and death, and are particularly damaging to the elderly (70 years of age or older), who average one fall per year (25% of them) ultimately die as a result of their injuries.

32.     The hazard due to falls at elevation caused by self closing doors is well understood. The typical underlying cause of the fall is that the victim is struck by a moving self closing door with sufficient force to knock them off balance thereby inducing a fall. The elderly and/or those with physical disabilities are at the greatest risk for several reasons, such as: (1) reduced mobility; (2) reduced speed of mobility; (3) reduced strength; (4) increased perception reaction time; (5) compromised balance and balance recovery; and (6) increased likelihood and/or severity of injury. As such, it is particularly important that the elderly and those with physical disabilities be afforded the utmost protection from the hazard associated with self

closing doors.

33.     In addition to the door closing speed requirements, the ADA regulations require

that where a door closer is used, in order to be accessible for disabled persons, there must be a

minimum of 12 inches of clearance on the push side of the door from the latch.

## DEFENDANTS' RENOVATIONS IN 2004 AND 2005

34.     In 2004 and 2005, defendants undertook a major project to renovate 57

first-generation Marriott Courtyard hotels throughout the United States (the "phase IV project"),

including the Marriott Courtyard hotel in Overland Park, Kansas.

35.     In all 57 hotels, defendants chose to design and install a spring-hinged door closer

without a delay mechanism in place of a door closer on the bathroom door of each purportedly

"ADA-accessible" guestroom.  Defendants did so deliberately, in an effort to avoid having to

comply with ADA requirements.  Defendants were confronted with an architectural dilemma

over design of the "ADA-accessible" guestrooms:  if the bathroom doors opened into the

bathrooms, the fixtures and possibly a wall would have to be moved in each "ADA-accessible"

room.  However, if the bathroom doors opened out, they could potentially come into contact with

the front door.  Defendants decided to avoid the cost of ADA compliance with the doors opening

in, choosing instead to have the bathroom doors open out.  To avoid the contact with the front

door, defendants determined to use a spring hinge so that the bathroom doors would be

self-closing and not contact the entry door.

36.     Defendants' decision to put spring-hinged door closers on the bathroom doors of

their "ADA-accessible" rooms violated the ADA .  Defendants knew that the design of a closer

on the bathroom doors would not comply with the ADA, as the rooms did not have 12-inch

clearance near the latch on the push side of the door (inside the bathrooms).  Obtaining that

clearance would require the same, or even more, changes to the wall configuration of the

bathrooms had the hotel designed the doors to swing into the bathroom.  Defendants chose to use

a spring-hinged door closer rather than a hydraulic/spring-arm type door closer, in an attempt to

evade ADA clearance requirements. Because a spring hinge can be used as a door closer, however, the use of a spring hinge as a door closer does not nullify or avoid ADA requirements.

37. Spring hinges are not ADA-compliant door closers. Among other things, they do not have delayed action mechanisms, which allow the hotel guest more time to exit before being hit by the door. In addition, the farther spring hinges open up, the quicker they snap back. The average peak velocity of a door being closed by a spring hinge accelerates at sweep area of the door where the hotel guest is positioned.

38. Use of the spring hinges in "ADA-accessible" rooms is an inaccessible design, violating the ADA, which requires accessibility to the extent feasible. Accessibility means it can be used safely by a disabled guest. To be accessible, any closer used on a doorway into or within an "ADA-accessible" guestroom must allow at least 5 seconds for the combined delayed action cycle and closing cycle (from 90 degrees to 12 degrees) and it must allow at least 3 seconds for the closing cycle (70 degrees to 5 degrees). Defendants did not take reasonable efforts to ensure that the spring hinges designed and installed into their hotels complied with these door closing speeds for closers.

INJURIES SUSTAINED BY PLAINTIFF

39. Sometime prior to March 19, 2006, while residing in Cook County, Illinois, plaintiff made a reservation to stay at the Marriott Courtyard hotel in Overland Park, Kansas, for a family trip to the area. At that time, plaintiff was a 76-year-old woman who suffered from physical disabilities and impairments on her mobility. Although she was not using a wheelchair at the time, plaintiff required the assistance of a walker for stability and mobility.

40. When plaintiff made her reservation for the hotel, she specifically inquired about the location of the room and the amenities available, given her physical limitations. In making her reservations, plaintiff was assured that she would be staying at a room that was specially designated for disabled hotel guests. Defendants agreed and represented that the room would be "ADA-compliant" and they would undertake utmost care in making the room safe for use by

disabled guests.

41.    On March 17, 2006, Ms. Scherr checked into the hotel and was given Room 143, a room the hotel represented was "ADA-accessible."

42.    On or about March 19, 2006, at approximately 12:30 a.m., plaintiff was in the bathroom of her hotel room, and she attempted to exit through an internal door on a self-closing spring hinge. To do so, plaintiff held onto her walker with one hand and with the other opened the bathroom door leading into the interior of her room. After opening the door out into the room with her right hand, and then walking through the threshold with her walker, the door quickly closed upon her, impacting with her body and causing her to fall to the ground with sufficient force to break both bones in her right wrist. There was no slip or trip on March 19, 2006. Plaintiff was taken by ambulance to the hospital, where she underwent emergency surgery. She had to spend two weeks in a Kansas hospital and rehabilitation center, and required further surgery on her wrist and around-the-clock home care upon her return to Illinois. Since her injury at the Marriott Courtyard hotel in Kansas, plaintiff has been forced to use a wheelchair and is not able to walk large distances on her own.

43.    As a proximate result of defendants' violations of the ADA, plaintiff sustained severe injuries to her body, all of which have caused and continue to cause plaintiff great mental, physical pain and suffering. These injuries included an open and compound fracture to the radius and ulna of the right forearm, which required two separate surgeries and a lifetime risk of deteriorating health and pain. Plaintiff's injuries also include an impact to her hip, causing her to lose what little mobility she has left.

44.    On March 19, 2006, prior to the impact with the door, Ms. Scherr did not slip or trip. It was the impact of the door which caused Ms. Scherr to fall.

45.    Based upon the scientific understanding of the physics and biomechanics of falls, Ms. Scherr's position of rest and the injuries she sustained can be viewed as signatures to the fall. Expert analysis in the related litigation reliably determined that the self-closing bathroom

-12-

door caused Ms. Scherr's fall. Ms. Scherr's description of the fall, including the initiation, descent, impact and post-impact phases, along with the injuries sustained and position of rest, establish to a reasonable degree of engineering certainty that the fall was caused by the unsafe condition of the bathroom door in Room 143.

46.     Using the fundamental principle of conservation of momentum, along with the angular velocity and weight of the door measured during the inspection, the peak lateral acceleration of Ms. Scherr's body during the incident was about 0.4 g's. Laterally applied perturbations as low as 0.2 to 0.3 g's have been shown to invoke loss of balance responses in both young and healthy elderly volunteers. The change in momentum applied to Ms. Scherr from the door was therefore sufficient to cause her to lose her balance, particularly since Ms. Scherr had pre-existing physical limitations that were the reason she specifically requested an ADA-accessible hotel room.

47.     The lateral shift in Ms. Scherr's center of mass initiated a sideways loss of balance to her right. Consistent with the natural protective reflexes associated with loss of balance, she outstretched her right hand to break her fall. The tolerance limit range for distal radius fracture is 325 to 635 lbs. Ms. Scherr sustained a force sufficient to cause fracture, of *at least* 325 to 635 lbs. Thus, Ms. Scherr's fall, including the initiation, descent, impact and post-impact phases, along with the injuries sustained, comports with a loss of balance caused by impact from the self-closing door.

48.     Based upon the bio-mechanical factors in this case, it would be erroneous to conclude Ms. Scherr's fall was caused by a slip or a trip. Ms. Scherr used a pitched forward posture during gait, and so a fall due to intrinsic factors would likely cause her to tip forward. This type of fall is less likely to be injurious, compared with a sideways fall, because Ms. Scherr could use her walker and bending of her hips and knees to slow her fall. That the force of Ms. Scherr fall was sufficient to sustain a distal radius fracture shows conclusively that her balance was disrupted by the door and not by a slip or a trip.

-13-

49.     At the time of plaintiff's injury, the spring-hinged door on the bathroom at defendants' hotel was dangerous, unsafe and presented an unnecessary and unacceptable risk to hotel guests, especially those who are disabled and request special amenities in connection with their disabilities. It is expected and foreseeable that elderly and disabled guests would be injured by spring-hinged doors closing automatically upon them.

50.     Defendants had full knowledge of the dangerous condition created by the use of a spring-hinge in an internal "ADA-accessible" guestroom and full knowledge of the intended use of the spring hinges in the "re-invention" project.

51.     The dangerous condition of the bathroom door and defendants' violation of the ADA, were the proximate causes of plaintiff's injuries, and the types of injuries she sustained as a result are exactly those that are most likely foreseeable from the dangerous condition.

52.     Defendants had actual and constructive notice of the dangerous condition prior to plaintiff's injury. Defendants knew that Marriott Courtyard hotels rent rooms to disabled guests that are held out as purportedly "ADA-accessible" rooms that are compliant with ADA-standards, accessible to guests with disabilities, and safe for their use. Defendants acted and continue to act deliberately in failing to adhere to their obligations, with full knowledge or awareness of the circumstances that would lead to the injury of hotel guests. Each defendant acted and continues to act in gross violation of its duties, with reckless disregard for the safety of hotel guests.

53.     As a further and proximate result of defendants' violations of the ADA, plaintiff was required to and did employ physicians and other medical providers for medical examination, treatment and care of these injuries and did incur and continues to incur medical and incidental expenses of approximately $100,000.

### ROOM 143 AT THE OVERLAND PARK, KANSAS HOTEL

54.     Defendants knew that, during the Phase IV renovation project of the Marriott Courtyard hotel in Overland Park, Kansas, Room 143 was to be an "ADA-accessible" room, it

needed to be brought up to full ADA compliance and defendants were obligated to perform their duties to make the hotel safe for use by disabled guests.

55.     An "ADA Analysis Summary," written by (design firm) Leo A. Daly to Marriott International regarding the Kansas City Overland Park Courtyard by Marriott hotel includes an asterisk by Room 143 that reads: "Existing guestroom that are partially complaint will need to [be] brought up to full compliance."

56.     As reflected in the "Facilities Accessibility Guide for Marriott Lodging" and "Marriott Accessibility Master Plan Worksheets," defendants also knew that ADA standards required internal doors in "ADA-accessible" rooms to close slowly to protect disabled guests. Marriott describes these engineering worksheets as property self-check guides which serve as the "Master Plan" for accessibility. "It is required that each Marriott-managed property have such a master plan." Section C of the "ADA Master Plan Worksheets" lists the requirements for ADA-accessible rooms. For example, Section C.2 refers to "Entrances – entry, bathroom, connection" and §C.2(h) (page 3C of 7) asks: "Does it take at least 3 seconds for the door to close?"

57.     Tri-South Construction, Inc., the general contractor for the hotel renovation project, and Marriott manager Lorraine Katzer noticed the spring hinges being constructed into the hotel's ADA bathrooms because, unlike any of the other doors at the hotel, it had a hinge which closed the door on its own when Katzer opened it. Katzer discussed the design of spring hinges in the ADA bathrooms with Tri-South superintendent Ken Schellaby. Tri-South, under the specifications contained in the project's Design Guide, was required to construct the rooms to be in compliance with the ADA.

58.     The project's Design Guide also required Tri-South to obtain door hardware from a qualified supplier who will serve as an experienced Architectural Hardware Consultant. In this case, Tri-South subcontracted with Duranotic Door Inc. to supply and install the spring hinges into the "ADA-accessible" rooms, and it supplied Martin Jennings – an experienced door salesman for nearly 30 years – with design plans showing the spring hinges to be supplied for

and installed into the bathrooms of the "ADA-accessible" guestrooms. Mr. Jennings understood that, when you use a spring hinge in place of a closer, you have to meet code requirements for door closers.

59.     During the renovation project, and up until the day prior to her deposition in the related litigation, Marriott manager Katzer was ignorant of ADA requirements for door closing speeds, of the Department of Justice ADA Checklist for New Lodging Facility, of the Marriott ADA Master Plan engineering worksheets, of Leo A. Daly's ADA summary and of the project's Design Guide specifications and requirements. Even though she was Chief Engineer at the time of the renovation, and was Assistant General Manager of the hotel at her deposition, Ms. Katzer never checked the closing speed of the self-closing bathroom doors.

60.     Manager Katzer was unaware of ADA requirements due to a policy of defendants, dictated by Marriott's legal department, to not enforce ADA requirements in connection with the design and construction of Marriott hotels and hotel renovations. In approximately 2000, Marriott's legal department instructed the design managers to stop using the Department of Justice checklist, as well as Marriott's own Accessibility Master Plan Worksheets. Marriott's design and construction arm was told they were "not the ADA police."

61.     Leo A. Daly Co. expressly noted that doors with closers should be adjusted to close from 90 degrees to 12 degrees in a minimum time of 5 seconds. But the design firm's plans and summary both call for doors with spring hinges to be adjusted to move from the 70 degree open position to the closed position in a minimum time of only 1.5 seconds. That is, a combined closing cycle time and latch time that is only one-half of what the ADA minimum requirement is for the closing cycle alone.

62.     During the related litigation, closing speeds of the bathroom door in Room 143 were measured using appropriately precise, reliable and standardized equipment. When initially opened to 70°, the door takes 2.58 to reach a distance of 3" from the latch. The subject door closer does not have a delayed action feature which regulates the closing speed during the

-16-

closing cycle. Thus, when initially fully opened to 140° and allowed to close under its own power, the sweep period of the closer takes only 1.29 seconds to travel from 70° to a distance of 3" from the latch.

63.     Measurement of the bathroom door in Room 143 shows a dramatic increase in velocity as the door sweeps towards the closed position. The velocity of the closing door increases until the door is about 15-20° from fully closed, at which point the velocity decreases sharply. Peak angular velocities of between 44 and 56 deg/sec are reached at 17° when closed from 70° and 14° when closed from the fully open position of 140.° The subject door accelerates through the sweep area where a user would be positioned and does not decelerate until nearly closed.

**DEFENDANTS' CONTINUED REFUSAL TO CORRECT
THE DANGEROUS AND UNSAFE CONDITION**

64.     An actual, present and justiciable controversy has arisen between plaintiff and defendants concerning whether the design, construction and provision of the spring-hinge in defendants' purported "ADA-accessible" guestrooms are consistent with the regulations, standards and requirements of the ADA.

65.     In the related action of *Scherr v. Marriott Int'l Inc., et. al.*, No. 08 C 2098 (N.D. Ill.), as recently as April, 2010, defendants have refused to correct the blatantly dangerous and unsafe conditions for disabled guests in the purportedly "ADA-accessible" guestrooms at the Overland Park, Kansas hotel and at the approximately 56 additional Marriott Courtyard hotels owned, operated, managed and/or controlled by defendants throughout the United States.

66.     In addition, defendants took the position during the related litigation that the spring hinges in the bathroom doors which effectively caused the doors to close do not constitute "door closers" and, as a result, are not subject to the ADA regulations with respect to "door closers."

67.     Defendants' claim that a spring hinge is not a "door closer" under ADA

-17-

regulations is utterly belied by the actual PBB spring hinge installed in the bathroom door of Room 143. For example, the spring hinge is labeled "Door Closer" and bears markings of a certification by Underwriters Laboratories, Inc. (UL), an independent product safety organization. PBB's literature for the SP81 Full Mortise Spring Hinge reads: "Spring hinge door closer Model K8107/K5107 passed a 1,000,000 cycle UL test *in accordance with Underwriters Laboratories for door closers*, with or without integral smoke detectors." A door closing device that is labeled and certified as a door closer falls within the ambit of ADA regulations over compliant door closers.

68.     In the UL online certification directory, the classification of spring hinges as a type of door closer is stated directly. Under "Use and Installation" information posted for "Swinging Fire Door Closers," the product safety organization states: *"Self- closing door closers* of either the surface mounted, floor mounted, concealed, semi- concealed, *or spring-hinge type* return the door to the closed position when opened." Under "Requirements," UL states: *"Door closers of the spring-hinge type* are investigated using the cycle endurance test in ANSI/BHMA A156.17-1999, 'Self Closing Hinges and Pivots.'" As further explained in a UL published article in 2008 entitled "The Evolving Requirements for UL Certification of Spring Hinges:" *"Because they are considered a closing device for swinging doors, spring hinges have traditionally been Listed by UL under the Swinging Fire Door Closers Category* in the UL Fire Resistance Directory. Prior to 2001, spring hinges were treated like arm-type door closers or floor springs found in this category and were tested in accordance with UL 228, the Standard for Safety of Door Closers-Holders, With or Without Integral Smoke Detectors."

69.     According to ANSI 156.17 – 2004 (American National Standard for Self Closing Hinges and Pivots), a spring hinge is defined as: "A hinge with flanges or leaves which attach to the door and jamb and are connected to the hinge pivot point(s) (barrel). Springs provide energy to close a door from the open position or, in some cases, open a door from the closed position." ANSI 156.4 – 2000 (Recommended Practices for Door Controls – Closers) does not provide a

-18-

definition for "door closer."

70.     According to the National Fire Prevention Association (NFPA) Standard for Fire Doors and Fire Windows, a spring hinge is defined as: "A closing device in the form of a hinge with a built-in spring used to hang and close the door." Door closer is defined by NFPA as: "A labeled device that, where applied to a door and frame, causes an open door to close by mechanical force. The closing speed can be regulated by this device." Nothing in these definitions limits a door closer solely to an arm-type closer. Since a door closer is defined as a device that closes a door, and a spring hinge is defined as a "door closing device," the spring hinge in Room 143 is a closer. It certainly meets the definition of "door closer" provided by the NFPA, since it is a device that causes an open door to close by mechanical force.

71.     Although spring hinges can be used as door closers, they usually lack delayed action mechanisms required to make them ADA-compliant. In the design plans for the renovation project at the subject hotel, the recommended manufacturer of the spring hinges was McKinney. According to the McKinney Hinge Catalog, a spring hinge is an "alternative closing device" when space considerations do not allow for use of an arm-type closer. The catalog is clear to point out, however, that spring hinges usually are not ADA-compliant: "*Spring hinges may not be suitable* for applications requiring a closing device with non-critical closing and latching speed adjustments. With respect to *meeting ADA requirements for closing devices*, carpeting and/or gasketing can interfere with latching."

72.     McKinney offers both Full Mortise and Half Surface Spring Hinges. McKinney now offers a Reverse Action, 1502R, (by special request) which allows the door to remain in the open position.

73.     A spring hinge is a specific type of door closer, even if it does not comply with ADA requirements. In the case of the bathroom door in Room 143, the spring hinge does not allow sufficient time under ADA-requirements and did not allow Ms. Scherr sufficient time to exit the bathroom using a walker without being struck by the door. An ADA-compliant closer

that incorporated a delayed action mechanism would have given Ms. Scherr additional time to exit the bathroom without being struck by the door. Due to non-compliant closing speeds on the bathroom door, Room 143 – though designated as being "ADA-accessible" – is not and was not safe or accessible for an individual with physical disabilities.

74.    Although the spring hinge that was designed and constructed in Room 143 bathroom door is not an ADA-compliant door closer, it is a closer still the same. While there is colloquial use of the term "door closer" to describe the hydraulic/spring arm-type device that closes a door, any other self-closing mechanism performing the identical function is a closer by another name.

75.    In the related litigation, defendants objected to plaintiff's request to amend her complaint to add a claim under the ADA, thereby effectively prolonging the continued existence of the dangerous and unsafe conditions challenged in this action. Notwithstanding plaintiff's significant injuries and demands in the related litigation, defendants rejected the opportunity to correct the dangerous and unsafe condition in their numerous hotels throughout the United States, deciding instead to maintain an unreasonably dangerous and unsafe condition for disabled guests in violation of the ADA.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff seeks a declaratory judgment from this Court that the Marriott Courtyard hotel in Overland Park, Kansas was and remains non-compliant and not accessible to the maximum extent feasible as required by the ADA. In addition, plaintiff demands injunctive relief against defendants, including an order requiring defendants to alter their Marriott Courtyard hotels throughout the United States so that such facilities are readily accessible to and usable by individuals with disabilities to the extent required by the ADA. Finally, plaintiff seeks

an award of costs, attorneys fees, expenses and an Order granting other relief as the Court may

deem just and proper.


Dated: November 16, 2010



By:    s/ Steven P. Schneck
       Steven P. Schneck
       One of the Attorneys for Plaintiff



JULIE L. FRIEDMAN
The Law Offices of Julie L. Friedman
P.O. Box 1334
Highland Park, IL 60035
Telephone: (847) 414-8615
jlfehrlich@yahoo.com



JEREMY L. FRIEDMAN
Attorney at Law
2801 Sylhowe Road
Oakland, CA 94602
Telephone: (510) 530-9060
jlfried@comcast.net


STEVEN P. SCHNECK
Robert D. Allison & Associates
122 South Michigan Avenue
Suite 1850
Chicago, IL 60603
Telephone: (312) 427-7600
spschneckjazzlaw@yahoo.com


Attorneys for plaintiff
Marjorie Friedman Scherr